# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.                                                            No. CR 01-1540 BB

**MELDON COOK,**
**HELENA COOK, and**
**ANTHONY BRITT,**

    **Defendants.**

## MEMORANDUM OPINION
## ON MOTIONS TO SUPPRESS

THIS MATTER comes before the Court on Defendants' motions to suppress [#43, #51] evidence seized following a warrantless search of Defendants' home. Having considered the original briefs, and following an evidentiary hearing on February 14, 2002, the Court is of the opinion the motions must be DENIED.

### I. *Facts*

Acting on citizen complaints of constant foot and vehicular traffic at the Cooks' residence, Bernalillo County Sheriff's Detective Ward Pfefferle drove his unmarked unit slowly and repeatedly by the residence to investigate. He observed a pickup truck and a black Camaro, both with Florida tags, in front of the Cook

residence. An NCIC computer check revealed the license on the Camaro came off a stolen pickup truck. During his surveillance, Detective Pfefferle became concerned when two men observing him left the yard and apparently entered the house, so he radioed for backup assistance. A woman and small child were in the front yard and Pfefferle got out and spoke to the female who said the Camaro belonged to her cousin. An ATV then pulled up and Detective Pfefferle told the driver, Anthony Britt, not to go into the house. Britt said he had tea boiling on the stove, but Pfefferle detained him anyway.

At that time, Deputy Andrew Ortiz arrived and "confronted" the male in the yard. (Tr. 45) Mr. Britt said there were two other people inside and he would get them and he headed for the door. Britt held the door for Ortiz who, for officer safety reasons, directed Britt in first. (Tr. 45-6) Deputy Todd Patton then arrived and followed both Britt and Ortiz through the door. Deputy Patton followed Ortiz and Britt and immediately as he crossed the threshold saw what appeared to be an automatic pistol[1] lying on the TV and smelled an ether odor which Patton associated with methamphetamine. Just then, Defendant Meldon Cook and Richard Buhrle exited from the kitchen area, and Patton moved to place

---

[1] Upon later examination, this proved to be a paint ball gun.

himself between them and the gun. Deputy Ortiz directed Buhrle and Britt outside. Mr. Cook was placed on the couch for questioning. As he conducted the sweep, Deputy Ortiz saw what appeared to be a methamphetamine laboratory in the laundry room next to the kitchen. Deputy Ortiz checked the rest of the residence for other people and asked Mr. Cook whether the chemicals present were active and dangerous.

While all occupants were held in the front yard for several hours, various police officers entered the house. T.F.O. Frank Chavez was called to the scene and entered the house at approximately 2:15 PM. He went in with Deputy Patton to investigate the methamphetamine laboratory. He opened the back door for ventilation, then came out to interview Mr. Britt and Helena Cook before going to get a warrant. Officer Chavez testified he did not ask for consent because based on prior contact "I figured that Meldon Cook would not give me permission." (Tr. 123) He did ask Ms. Cook who denied consent. (Tr. 124).

Detective John Sharkey was also called to the scene midafternoon to verify a possible methamphetamine lab. As he walked through the living room with Deputy Patton, he "saw a scale with white residue and what looked like a firearm." (Tr. 145-6) After looking around the laundry room, he concluded it was a meth lab but a "cook" was not in progress. (Tr. 147) He left the house,

3

"Mirandized" Mr. Cook, and requested consent to search the house. It was denied and Officer Chavez proceeded to get a warrant at approximately 7:00 PM. (Tr. 126)

## II. *Discussion*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their ... houses." U.S. CONST. AMEND. IV; *see also Payton v. New York*, 445 U.S. 573, 589 (1980); *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording for the Fourth Amendment is directed.") It is, therefore, well established that warrantless searches "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347 (1967). In the present case, the Government argues the warrantless entry of the Cooks' home was justified by (1) exigent circumstances and (2) implied consent.

### A. *Exigent Circumstances*

It is the Government's burden to prove that sufficient exigency existed. *Chimel v. California*, 395 U.S. 752, 762 (1969); *United States v. Scroger*, 98 F.3d 1256 (10th Cir. 1996). Whether the burden has been met is judged from the

perspective of the "prudent, cautious and trained" officer. *Scroger*, 98 F.3d at 1259. The Government has not met its burden on this issue.

The exigent circumstances exception to the Fourth Amendment forbids a warrantless entry unless: (1) officers are in hot pursuit of a fleeing felon; (2) there is a need to prevent a suspect's escape; (3) there is a danger of the destruction of evidence; or (4) a risk to police or citizens. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. Anderson*, 154 F.3d 1225, 1234 (10th Cir. 1998), *cert. denied*, 526 U.S. 1159 (1999). The Government does little to specify which element of the exigent circumstances exception upon which it relies but the only "exigency" evidence provided by the officers who entered the house was that they responded quickly to Detective Pfefferle because "he was excited." (Tr. 75)

Detective Pfefferle testified he had "concern" because "[a] lot of times with stolen vehicles, those types of crimes in general, people are armed." (Tr. 9) However, an officer's "unjustified but sincere fear" will not suffice to prove requisite "emergency." *United States v. Hudson*, 100 F.3d 1409, 1417 (9th Cir. 1996) ("Otherwise, the protection of the occupants' privacy interest would depend on no more than an officer's anxiety.") Detective Pfefferle's actions demonstrate no reasonable and objective fear. He stood in the open in the front

yard while questioning Ms. Cook, assuming the two males were inside. Nor did Detective Pfefferle say anything when radioing for backup that would indicate an objective basis for apprehension. The fact the responding officers believed that they heard anxiety in Pfefferle's voice when calling for backup also fails to provide the exigent circumstance which would justify a warrantless entry. *Cf. Smith v. Thornburg*, 136 F.3d 1070, 1084 (6th Cir. 1998) (warrantless entry into glove box not justified on public safety grounds merely because a car left running on private property); *Antonelli v. Neopolitan*, 1985 U.S. Dist. LEXIS 17292 *9 (N.D. Ill. 1985) (officers investigating stolen vehicle illegally entered home to check tip on runaway teen). This appears particularly true since at the time Deputies Ortiz and Patton entered the house, there were already three officers on the premises.

### *Consent*

The Government also relied on the consent to entry provided by Mr. Britt. It is undisputed there was no explicit consent to search the Cooks' residence (Tr. 54, 91, 162). However, Anthony Britt consented, at least implicitly, to Deputy Ortiz's entry. The direct examination of Deputy Ortiz provided the following:

Q.	Now, let me ask you this: Who went in first, him or you:

> A. He stepped inside first. When I got to the door he was right there at the door holding the door open, and then I held it and let him go inside.
>
> Q. How many doors were there?
>
> A. There was a screen door and another door.
>
> Q. Explain how he went in. By using the doors, tell us what happened.
>
> A. He opened the doors, like I said, and he was holding the doors open, because I had to tell him to hold on, not to go inside the residence. And then I walked up to where he was, and then I grabbed the doors and told him, "Go ahead and go inside," because I didn't want to walk in front of him, turning my back to him.
>
> Q. So you followed him in?
>
> A. Yes.

Tr. 46.

Deputy Patton testified in a similar vein that Britt held the door for the detectives:

> … And I saw Deputy Ortiz going to the front door of the residence. So I followed him.
>
> Q. You mean Ortiz?
>
> A. Yes.
>
> Q. All right. And what happened as you went to the front door of the residence?

7

> A. As we got to the front door, a subject was there, as far as I remember. He was there — he was holding the screen door open with his right hand. And the wood door to the house was already open. And Deputy Ortiz, I believe, asked him, is there anybody else in the house, or something like that. And he said yes, and he held the screen door open, and then started to walk towards the living room. So Deputy Ortiz followed him through the door, and I was right behind Deputy Ortiz.
>
> Q. Now, is this person, by the way, later identified as Anthony Britt?
>
> A. Yes.

Tr. 76-7. This is also supported by defense witness Richard Buhrle who testified[2] as follows on this subject:

> Q. And what about Tony, Anthony Britt?
>
> A. He kind of let them in, I guess.
>
> Q. And did they say anything as they were coming in?
>
> A. No — "Everybody needs to go outside," that was it.
>
> Q. Did they ever ask anyone for permission to come in?
>
> A. No.

Tr. 162.

---

[2] While this Court finds Buhrle's testimony on other subjects (*e.g.*, his reason for being present, possession of car keys, and knowledge of the lab) completely untrustworthy, on this subject it was not in his interest to testify as he did, and he therefore provides collaboration for the deputies' testimony.

8

> Q. Did I understand your testimony earlier to be that Mr. Britt let them into the house?
>
> A. Yeah, I guess so. That's the only thing I can figure. He held the door open for them as they walked in.

Tr. 169-70.

Since it is undisputed that Mr. Britt lived in the house, no one contests his apparent authority to give consent for the police entry. *United States v. Rith*, 164 F.3d 1323, 1331 (10th Cir. 1999); *Lenz v. Winburn*, 51 F.3d 1540, 1549 (11th Cir 1995). There is also substantial authority supporting the conclusion that by holding the door open for the police, Mr. Britt gave implicit consent to enter the house. *See United States v. Patten*, 183 F.3d 1190, 1195 (10th Cir. 1999); *United States v. Gordon*, 173 F.3d 761 (10th Cir. 1999); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir.), *cert. denied*, 528 U.S. 886 (1996); *United States v. Griffin*, 530 F.2d 739 (7th Cir.), *cert denied*, 519 U.S. 942 (1976); *State v. McLain*, 367 A.2d 213, 216 (Me. 1976).

Once immediately inside the screen door, both deputies smelled a strong chemical odor they associated with the manufacture of methamphetamine. Deputy Patton also saw what appeared to be a gun. At that point there was clear evidence a crime was or had recently been committed on the premises. *United*

*States v. Turner*, 119 F.3d 18, 19-21 (D.C. Cir. 1997); *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995). At this point a further search was justified for both officer and public safety. *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997); *United States v. Chavez*, 812 F.2d 1295, 1299-00 (10th Cir. 1987).

The Court therefore finds the police entered Defendants' house with consent, then developed probable cause based on what they smelled and saw in plain view. Defendants' motions must be Denied.

*[signature]*
**BRUCE D. BLACK**
**United States District Judge**

**Counsel for Plaintiff:**
  Stephen R. Kotz, Assistant U.S. Attorney, Albuquerque, NM

**Counsel for Defendants:**
  *Meldon Cook*: Joseph W. Gandert, Assistant Federal Public Defender, Albuquerque, NM
  *Helena Cook*: Clifford M. McIntyre, Albuquerque, NM
  *Anthony Britt*: Martin Lopez, III, Albuquerque, NM